## BROWN *v.* CITY OF ATLANTA *et al.; et vice versa.*

1. The amendment to the constitution of 1877, proposed by the legislature in 1918 (Acts 1918, p. 915), and ratified by the people in November of the same year, authorizing any municipal corporation within the State, having a population of one hundred and fifty thousand or more, to incur a bonded debt or debts for the public purposes of such corporation as provided in the amendment, is not self-executing, but by its terms an enabling act must be passed by the legislature, and such act shall not become operative until it shall have been affirmed at a general election held for the election of a mayor and general council in such municipality falling within the class described in the amendment, by two thirds of the qualified voters thereof who may vote at the election. While the enabling act has been passed by the legislature, it has not been affirmed as provided in the constitutional amendment, and therefore is not operative.

(*a*) The above amendment to the constitution is not *exclusive*, but is cumulative of the authority to vote upon and issue bonds as provided in art. 7, sec. 7, par. 1, of the constitution.

(*b*) The City of Atlanta falls within the class designated in the foregoing amendment to the constitution.

2. Under a proposed amendment to art. 7, sec. 7, par. 1, of the State constitution (Acts 1918, p. 99), which proposed amendment was subsequently ratified by the people, all laws, charter provisions, and ordinances theretofore passed or enacted, providing for special registrations of voters in municipal corporations and other political divisions of the State, such special registrations to be used in elections to vote on the issuance of bonds by such municipal corporations, etc., are null and void. And the General Assembly, under such amendment, has no power to pass or enact any law providing for such special registration.

(*a*) The pleadings and evidence in this case examined: *Held,* that the registration of voters preceding the bond election of March 8, 1921, in the City of Atlanta, is a general and not a special registration of voters.

(*b*) Under the above amendment two thirds of the qualified voters voting at an election to incur a debt by the municipal corporation by the issuance of bonds, as prescribed by law, shall be sufficient for that purpose; provided that two thirds so voting shall be a majority of the registered voters.

3. The 19th amendment to the constitution of the United States, providing that the right to vote shall not be denied or abridged on account of sex, is self-executing, and removes the electoral disqualification on account of sex.

(*a*) Under the general registration of voters, as made by the City of Atlanta, for the purpose of determining whether bonds should be issued or not, at an election held March 8, 1921, the female voters were prima facie qualified to vote; and the burden was on the intervenor to show irregularities, if any, disqualifying them. If the female voters were not qualified to vote, it does not appear that their voting would

have changed the result of the election; and in such circumstances this furnished no cause for declaring the election void.

(*b*) Where the attention of the voters was called by the city registrar to the contents of the registration oath prescribed by the city .code, and the voters subscribed their names thereto, this was a substantial compliance with the requirement of the city code as to administering such oath.

4. Where the duly elected managers of a municipal election held in the City of Atlanta, for the purpose of determining whether or not bonds should be issued for municipal purposes, submitted the consolidated returns to the mayor and general council of such city, " and consolidated and the result declared," showing that the election resulted in favor of bonds, such consolidation was prima facie correct; and the burden would be on the intervenor to show that the result was inaccurate and different from that submitted by the mayor and general council of the city, and the intervenor failed to carry that burden.

Nos. 2681, 2682, 2688. NOVEMBER 17, 1921.

Validation of municipal bonds. Before Judge George L. Bell. Fulton superior court. May 6, 1921.

An election was held in the City of Atlanta on March 8, 1921, for a proposed issue of bonds for municipal purposes, amounting to $8,850,000. The result of the election was declared to be in favor of the issuance of the bonds; notice was served upon the solicitor-general of the Atlanta circuit, and suit was filed by him in behalf of the State, for the validation of the bonds. A time was set for a hearing, advertisement was made, and the City of Atlanta appeared at such time and made answer, admitting generally the facts alleged by the solicitor-general. No objection to the validation of the bonds having been filed, the court passed an order validating them. Subsequently, and on the same day, Walter R. Brown moved to set aside the order of validation, and to be allowed to intervene. The court set aside the order validating the bonds, and permitted the intervention to be filed. To this order both the City of Atlanta and the State of Georgia excepted; and these exceptions are the subject-matter of the cross-bills of exception filed by the City of Atlanta and the State of Georgia respectively. On the hearing the presiding judge made an order validating all of the bonds.

The case as made by the solicitor-general for the validation of the bonds was in substance the following: The petition recited service of notice by the City of Atlanta that the election on the question as to whether the bonds should be issued or not had been

held, and that the election resulted in favor of the issuance of the bonds; the amount to be issued; the purposes for which the bonds were to be issued; the rate of interest to be paid, and how paid; and prayed an order requiring the City of Atlanta to show cause why the bonds should not be validated. The City of Atlanta appeared and filed an answer to the petition, admitting that proper notice was served on the solicitor-general of the Atlanta circuit, and setting out in detail the various issues of the bonds. The answer also recited the fact that an election was held for the purpose above stated, on March 8, 1921, and also the description in the notice of the various issues of bonds, the amount and purpose of each issue, and the denomination of each, the rate of interest and the time of payment of principal and interest; and also admitted that the provisions for a tax levy and sinking fund were true. It was further alleged that the total number of qualified voters who were entitled to vote in this election was 27,070; that the election resulted in favor of the issuance of the bonds voted for, by a requisite two-thirds vote of those voting in the election of March 8, 1921; and that such two-thirds vote was a majority of the total vote registered. It was also admitted by the city that the resolution was adopted by the mayor and general council, directing the service of the notice upon the solicitor-general of the Atlanta circuit; and that the copy of the advertisement inserted in the notice was correct, and that it was published thirty days before the election in the newspaper in which the sheriff's advertisements for the county in which Atlanta is located were published. It was further answered by the city that it had proceeded with reference to the advertisement, and the holding of the election and declaring the result thereof, in accordance with the law. It was further answered that under art. 7, sec. 7, pars. 1 and 2, of the constitution of the State of Georgia, the requirements of that provision of the constitution with reference to holding the election were set out, and that the city had complied therewith. Copies of the ordinances passed by the mayor and general council of Atlanta, calling for the election, were attached to the petition. It was further averred that under art. 2, sec. 4, of the constitution of Georgia, the General Assembly was authorized to provide for the registration of voters, and that under an act of the General Assembly of 1893 (Acts 1893, p. 174) the charter of the City of Atlanta was

amended, and under such amendment the mayor and general council had authority to provide for the registration of voters prior to any municipal election, and no person, under such amendment, would be permitted to vote unless registered. The tax-collector of Fulton County was appointed the official registrar. It was averred that under the above-recited act the City of Atlanta had passed an ordinance under which a system of general registration was provided, whereby a person who paid his taxes and made oath to that effect was registered by the county tax-collector for the city. It was further averred that the registrar made up a list of the voters from all who had registered prior to any bond or municipal election; that after the passage of the above act the city had no special registration system, and the county tax-collector, as registrar for the city, put every one who had registered prior to any municipal election on the registration list; that prior to this act the city had by ordinance a system of special registration, and under this ordinance a time for the beginning and ending of the registration was provided prior to any election. It was averred that when the bond election of March 8, 1921, was held, all persons who had registered with the county tax-collector, acting as city registrar, were registered and permitted to vote. A registration-list of the voters was thus made out, and when any one registered after the list was made out, a supplemental list, or certificate, was given if desired, and those holding such certificates were permitted to vote. There was no ordinance of the city providing for *special* registration in this bond election, and there was no special registration therefor. The registrar registered those who made the required affidavit, and the names were put upon the registration-list, and supplemental list, and they were permitted to vote, if they so desired. The ordinance providing for this system of general registration was set out. The county tax-collector as city registrar made two reports to the mayor and general council, which were accepted by the city and placed upon the minutes. It was averred that the consolidated returns of the managers of the bond election were made to the mayor and general council on March 21, 1921, and were consolidated and the result declared. The notice given to the public of the proposed validation was set out, and it was affirmed that all the facts set out in the resolution, notice, and ordinances concerning the proposed issue of bonds were true. It

was averred that the voters participating in the last general election held in the City of Atlanta on the first Wednesday in December, 1920, as shown by the tally-sheets of that election, amounted to 2360; and this was referred to as an additional reason why the election held was valid, because more than two thirds of the above number participated in and voted for the bonds in the election of March 8, 1921. It was averred that the total number of voters registered and qualified to participate in the last general election on the first Wednesday in December, 1920, amounted to 18,587, and that more than two thirds of the voters so registered voted in the bond election of March 8, 1921, and that two thirds so voting was a majority of the total number of voters so registered. It was also averred that two thirds of those voting at the bond election constituted a majority of the total registered voters of the City of Atlanta, qualified to vote in said election; and that the city had complied in all respects with the law governing bond issues. The petition prayed the judgment of the court validating the issue of bonds, which was set out in detail, etc.

The city introduced certified copies of the resolutions and ordinances referred to in its answer; also the notice served on the solicitor-general, together with his acknowledgment thereof; also certified copies of the various ordinances of the mayor and general council, which were referred to in the answer. The tax-collector of the county, who it was alleged was the registrar for the municipality, testified orally to the number of votes registered; and that he registered all those who applied for registration, including females, giving the approximate number of each class in accordance with the facts set out above. On the date set for the hearing, March 26, 1921, an order was made, validating the bonds; and exception was taken by the intervenor to this order. Further facts will sufficiently appear in the opinion.

R. B. Blackburn and Little, Powell, Smith & Goldstein, for plaintiff in error.

J. L. Mayson, J. M. Wood, W. H. Terrell, and John A. Boykin, solicitor-general, contra.

HILL, J. (After stating the foregoing facts.)

1. On August 19, 1918, the legislature passed an act (Acts 1918, p. 915) proposing an amendment to the constitution of the State of Georgia, as follows: "Reserving to the municipal cor-

porations the benefit of all provisions of the constitution of force in this State, the General Assembly is hereby empowered to authorize any municipal corporation within the State, having a population of one hundred and fifty thousand or more, according to the census of the United States government taken next preceding the approval of any act passed in pursuance hereof, to incur a bonded debt or debts for the public purposes of such municipality, the said debt or debts so to be incurred to be for such sums and to be secured after such manner, and to be paid, principal and interest, at such times and such places and by such means and upon such terms as the General Assembly may prescribe. Provided, however, that no act conferring the powers aforesaid, or any of them, shall become operative until the same shall have been affirmed at a general election held for the election of a mayor and general council in such municipality by two thirds of the qualified voters thereof who may vote at said election. Such two thirds to constitute at least a majority of the qualified voters of said municipality." This proposed amendment to the constitution of the State was subsequently ratified by the people at a general election held in November thereafter, and is known as the Atkinson amendment, so called because it was introduced and pressed to passage by the late lamented Judge Spencer R. Atkinson, a former member of this court. The bond election held on March 8, 1921, as set out in the foregoing statement of facts, was evidently held with reference to the time of its holding under the constitutional provision as it existed prior to the amendment above set out. This provision is as follows: " The debt hereafter incurred by any county, municipal corporation, or political division of this State, except as in this constitution provided for, shall not exceed seven per centum of the assessed value of all the taxable property therein; and no such county, municipality, or division shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue, not to exceed one fifth of one per centum of the assessed value of taxable property therein, without the assent of two thirds of the qualified voters thereof at an election for that purpose, to be held as may be prescribed by law; but any city, the debt of which does not exceed seven per centum of the assessed value of the taxable property at the time of the adoption of this constitution, may be authorized by law to increase, at any time, the

amount of said debt, three per centum upon such assessed valua-
tion;" etc.   The intervenor in the present case contends that the
constitutional amendment referred to above is *exclusive* so far as
the City of Atlanta is concerned, inasmuch as the City of Atlanta
has a population of one hundred and fifty thousand and more, and
therefore that it falls within the class to which the amendment
exclusively applies; and that the City of Atlanta, after the adop-
tion of the Atkinson amendment to the constitution, must vote
bonds, if at all, as provided in the constitutional amendment, and
that it could not vote for bonds under any other provision of the
constitution.   With reference to this phase of the case, therefore,
the question is whether the above constitutional amendment of
1918, known as the Atkinson amendment, is exclusive, or whether
it is merely cumulative of the power to issue bonds under that
provision of the constitution last above quoted.   We are of the
opinion that the amendment is not exclusive, but is merely cumu-
lative.   It will be observed that the first sentence of the amend-
ment begins with " Reserving to municipal corporations the ben-
efit of all provisions of the constitution in force in this State, the
General Assembly is hereby empowered," etc.   This language is broad
enough to cover *all* the municipal corporations of the State, in-
cluding Atlanta with her population of more than one hundred
and fifty thousand.   This amendment was evidently passed and
adopted with the view to authorizing cities of the class indicated
to incur a bonded debt or debts for the public purposes of such
municipality, without· reference to the amount of such bonded
indebtedness, etc., because the amendment provides that the debts
so to be incurred may be " for such sums and to be secured after
such manner, and to be paid principal and interest at such times
and places and by such means and upon such terms as the General
Assembly may prescribe."   It will be seen, therefore, that there
is no limit as to the amount of the debt to be incurred or the time
when such principal and interest may become due under the amend-
ment to the constitution.   But, in order to safeguard the tax-
payers of the municipality against an unreasonable and unlimited
amount of bonds being issued, no doubt, it is provided that *no act*
conferring the powers above mentioned shall become operative un-
til the same shall have been affirmed at a *general election* held for
the election of a mayor and general council in such municipality

by two thirds of the qualified voters thereof who may vote at such election, etc. The amendment is not, therefore, self-executing. It requires an enabling act to carry it into effect; and while such enabling act was passed (Acts 1919, p. 260), it has never been ratified or adopted by the City of Atlanta as required by the amendment to the constitution, so far as the record discloses, and it is inoperative until it has been so ratified. Therefore the City of Atlanta, while coming within the class designated in the Atkinson amendment, still has the power and authority to issue municipal bonds under art. 7, sec. 7, par. 1, of the constitution of the State of Georgia (Civil Code of 1910, § 6563), as quoted above; and this election was evidently held under this provision of the constitution. We are of the opinion that neither the legislature nor the people meant by the Atkinson amendment to take away from municipalities of the class designated in that amendment the right to issue bonds; and if the Atkinson amendment is held to be exclusive, it would have that effect, inasmuch as the enabling act has never been, and may never be, ratified or affirmed. The enabling act of 1919, supra, passed in pursuance of the constitutional amendment, provides that municipal corporations of this State having a population of one hundred and fifty thousand or more are empowered and authorized to incur a bonded debt or debts for the public purposes of such municipality, provided that the issuance of such bonds " is voted affirmatively at a general election held at the same time that the election of the mayor and general council of such municipalities is held, by two thirds of the qualified voters thereof who may vote at said election, said two thirds to constitute at least a majority of the qualified voters of such municipality." It is contended by the intervenor that the present bond election is invalid, because it was not held at a *general* election held at the same time that the election of mayor and general council of the City of Atlanta was held. As said above, the Atkinson amendment not being exclusive nor self-executing, but only cumulative, " an election for that purpose, to be held as may be prescribed by law," and in conformity with art. 7, sec. 7, par. 1, of the constitution of the State (Civil Code, § 6563), would be valid though not held at a general election, provided, of course, all other legal requirements were complied with. Civil Code, § 440.

2. Another objection offered by the intervenor against the validation of the bonds voted at the election of March 8, 1921, is that it contravenes what is known as the Brown amendment to the constitution. That amendment was proposed by the legislature at the same session which proposed the Atkinson amendment, supra, viz., in August, 1918, and was subsequently ratified by the people at the general election held in November, 1918. The Brown amendment provides, " That paragraph 1, section 7, article 7 of the constitution of this State be  .   . amended by inserting between the word ' thereof ' and the word ' at,' as they occur in the tenth line of said paragraph, the following: ' voting, provided said two-thirds so voting shall be a majority of the registered voters; and provided further, that all laws, charter provisions, and ordinances heretofore passed or enacted providing special registration of the voters of counties, municipal corporations, and other political divisions of this State, to pass upon the issuance of bonds by such counties, municipal corporations, and other political divisions, are hereby declared to be null and void; and the General Assembly shall hereafter have no power to pass or enact any law providing for such special registration, but the validity of any and all bond issues by such counties, municipal corporations, or other political divisions, made prior to January 1, 1918, shall not be affected hereby." It will be seen that the Brown amendment provides that all laws, charter provisions, and ordinances heretofore passed or enacted, providing *special registration* of the voters of municipal corporations, to pass upon the issuance of bonds, are declared to be null and void. The question raised therefore is whether the registration preceding the bond election of March 8, 1921, is a special registration, or whether it is a general registration. It must be conceded that if it is a special registration, the Brown amendment being self-executing and not requiring an enabling act to carry it into effect, as is the case in the Atkinson amendment, the registration would, by the terms of the amendment, be null and void, and consequently an election held under it would likewise be invalid. But we do not think that the registration of the voters for the bond election in the instant case is a special registration, but on the contrary that it is a general registration, as we shall endeavor to show. The Brown amendment changed the provision of the constitution as to the method

of ascertaining the registered vote, and as to the method of registration. It prohibits *special registrations,* and requires that in all elections on the question of the issuance of bonds the political subdivisions of the State, including municipalities, should use the general registration list. The evidence in the record shows that the registrar, who was the tax-collector of the County of Fulton of which Atlanta is the county site, was created the registrar, not only for the State and county, but also for the City of Atlanta. He testified: " All persons were registered who made oath that they had paid all taxes except those for the current year, and answered the questions which qualified them to vote. I put those on the registration list. . . Every one that came around there to register, that was qualified, was registered. I had no complaint from any person that they were qualified to register and had not been allowed to register; and if there had been trouble on this line, they would naturally have come to me as registrar. . . We used certificates as a supplemental list. Books of registration were open at the city hall and at the tax-collector's office. There were two windows; one for white and one for colored. . . People whom I registered were not registered separately for the State and county. There was only one registration as to these voters, both city and county at the same time. . . I have only one list of registration, city, State, and county; and the list I made up for the city in the election was from that list, and those people took the oath that they had paid all taxes. If another election was called this year, say in December or October, I will use the same registration list as was made up for the city election, plus any additions that might come in between now and then. A party is not required to register but one time, and I would add to it any party who registered for another election, city, State, and county. They do not register any more." It appears also that females as well as males who qualified were permitted to register and vote. It appears that any person who registered between January 1, and March 8, 1921, and others who had previously been registered prior thereto, and who made the oath that they had paid the taxes required of them the year previous to registration, were put on the list and permitted to vote, and any person so registering was put upon the permanent registration list. The charter of the City of Atlanta was amended in 1893 (Acts 1893, p.

172), so that section 154 of the charter as amended reads as follows: " That the mayor and general council of said city shall have full power and authority to provide for the registration of voters prior to any municipal election in said city; to make all needful rules and regulations for the same, and require that no person be permitted to vote unless registered as aforesaid; to constitute and appoint the tax-collector of Fulton County to the office of registrar of said city; to fix his compensation as such registrar, and when so appointed to require him to perform the duties of said office." Section 2 of the act provided: " That the registration intended under this act shall take effect at such time as the said mayor and general council shall fix by ordinance, and until then the present mode of registration for said city shall exist." In pursuance of this amendment to the city charter, ordinances were adopted by the city carrying this legislation into effect. These ordinances were attached to and made a part of the answer of the city in this case, and they designated the tax-collector of Fulton County or his assistants as authorized to register qualified voters of the city as they paid their taxes annualy. Section 2131 of the City Code of Atlanta provides: " It shall be the duty of the tax-collector of Fulton County or his assistants to register the qualified voters of said city as they pay their taxes annually. For this purpose he shall have prepared printed blanks, containing the oath required of the voters proposing to register, in the form prescribed in this ordinance, and it shall be his duty to administer to such taxpayer wishing to register the required oath; and the voter shall subscribe to said oath in the presence of such collector or his assistants, who shall preserve all of said affidavits, and from them shall compile a book for each ward showing the names and residences of the qualified voters for each ward, giving streets and numbers, or, if no number, then giving the street each side or nearest to the numbers on street in front." Section 2133. " The collector, or his assistant, shall also register qualified voters taking the prescribed oath, even if they do not pay or offer to pay the taxes for the current year, and place their names on the books of their respective wards, as provided in the preceding sections," etc. And then follows the oath to be required of all voters registering their names. It seems, therefore, that the charter amendment of the City of Atlanta and the

ordinances passed in pursuance thereof, provided for a general and not for a special registration. A special registration as distinguished from a general registration is one designed for a particular election and which becomes functus officio when the election under which it was held has been had, that is to say, when the registration can not be used for any other purpose. A general registration is one made up under general rules. In view of the foregoing and the evidence adduced on the trial, we hold that the registration for the election held on March 8, 1921, was a general and not a special registration. See Pol. Code (1910), §§ 41, 43, 46. And in so far as the two foregoing exceptions to the judgment of validation are concerned, the bonds which were validated by the trial judge were authorized by the election as provided in art. 7, sec. 7, par. 1, of the constitution as amended by the Brown amendment. Under the Brown amendment to the constitution two thirds of the qualified voters voting at an election to incur a debt by the municipal corporation by the issuance of bonds, as prescribed by law, shall be sufficient for that purpose; provided, that two thirds of the voters so voting shall be a majority of the registered voters, etc.

3. Exception is also taken to the judgment validating the bonds; and it is insisted that the same was void, because it did not affirmatively appear that the persons who voted in favor of the bonds constituted a majority of the registered voters of the city. It is insisted that art. 2, sec. 1, par. 1, of the constitution (Civil Code (1910), § 6395), provides one of the qualifications of voters in this State. This constitutional provision is as follows: " After the year 1908, elections by the people shall be by ballot, and only those persons shall be allowed to vote who have been first registered in accordance with the requirements of law." Intervenor insists, under this constitutional requirement, that the registrar did not require voters to comply with this provision as to registration, in that a large number of voters, including ten thousand women, had not qualified as registered voters of this State under the constitution and statutes passed in pursuance thereof, and that this so invalidates the list that was made up that it is impossible for the court to determine from the evidence what was the number of registered voters legally voting; and the plaintiff in error contends that the burden of furnishing the

proof by which the court could ascertain the number of legally registered voters in the City of Atlanta on the date of the election, in order to determine whether the bonds in question have been authorized by a majority of the legally registered voters of the city, was upon the plaintiff, and that this burden was not carried. It appears from the record that the oath to be required of all voters registering their names shall be in the following form: " Georgia, Fulton County. I do swear, or affirm, that I am a citizen of the United States; that I am twenty-one years of age, or will be on the —— day of ——— of this calendar year; that I have resided in this State for one year, and in this county for six months, immediately preceding the date of this oath, or will have so resided on the —— day of this calendar year; that I have paid all the taxes which, since the adoption of the constitution of 1877, having been required of me, except taxes for this year; that I possess the qualifications of an elector re- quired by the constitutional amendment adopted in 1908; and that I am not disfranchised from voting by reason of any offense committed against the laws of the State. I further swear, or affirm, that I am a citizen of Atlanta, and reside in the —— ward of the City of Atlanta, at No. —— on —— street, or in the —— district G. M. My age is ——, my occupation is ———.

(Sign here)

Sworn to and subscribed before me this—1921. Registrar."

The city registrar testified that all those whose names were placed upon the general registration list for the city subscribed to that oath. As to the registration of women voters, the plaintiff in error contends that " If enabling legislation be necessary to carry the last amendment of the Federal constitution into effect, that legislation has not been enacted." The nineteenth amendment to the constitution of the United States provides that the right of suffrage shall not be denied on account of sex. The constitution of the United States is the supreme law of operation in this State. Civil Code (1910), § 1. The nineteenth amendment became automatically operative on August 26, 1920. Graves v. Eubank, 205 Ala. 174 (87 So. 587). We are of the opinion that that amendment is self-executing and that under it females are not now disqualified on account of their sex to register and to vote, but on the contrary they are qualified. Graves

*v.* Eubank, supra. In Neal *v.* Delaware, 103 U. S. 370 (26 L. ed. 567), the question was what effect the fifteenth amendment to the constitution of the United States had upon the laws of Delaware, which were to the effect that all jurors should be " white male electors." It was held that the fifteenth amendment had the effect, ex proprio vigore, of striking. from the laws of Delaware the word " white," and left the remainder of the law intact. So we think in the present case, where the nineteenth amendment strikes the word " male," as used in defining who may become qualified voters. The evidence in the case discloses that all of the females who registered swore that they had paid all taxes due by them, etc. And when they subscribed to the oath prescribed by the city, they were entitled to be registered and to vote in the municipal election. Civil Code (1910), § 41 et seq. We are also of the opinion that where the attention of the voters was called to the contents of the oath by the city registrar, and they subscribed their names thereto, as testified by the city registrar, although they were not formally sworn, this was a substantial compliance with the requirement of the provision of the city code as to administering the oath to such person qualifying for registration. Civil Code (1910), §§ 41-46, as to this being sufficient. And see *Brumby* v. *Marietta,* 132 *Ga.* 408 (2), 410 (64 S. E. 321). See Civil Code (1910), §§ 42, 43. And when the plaintiff has thus made a prima facie case as to who constitute legal voters in said election, and that is denied by the intervenor, the burden of proof is shifted from the plaintiff to the intervenor to overcome the evidence offered by the plaintiff. The intervenor offered no evidence. In the case of *Harrell* v. *Whigham,* 141 *Ga.* 322, 325 (80 S. E. 1010), it was said: " If the petition of the solicitor-general has alleged the facts required by the statute, and citizens are made parties for the purpose of contesting the validation of the bonds, necessarily they stand as quasi defendants. When they deny the substantial allegations of the petition of the solicitor-general, this places upon *him* the burden of proving such allegations. In certain cases, where citizens who have become parties raise objections which do not appear in the pleadings between. the solicitor-general and the municipality, but which depend for their support upon aliunde evidence, the burden of sustaining such allegation is upon the citizens alleging them.

*Spencer* v. *City of Clarkesville,* 129 *Ga.* 627 (59 S. E. 274). This may be analogised to the affirmative pleadings of a defendant in an ordinary action at law. In ordinary lawsuits, an allegation by the plaintiff and a denial by the defendant puts the burden upon the plaintiff. If the defendant sets up an additional affirmative plea, as to it the burden is upon him." As said above we think the plaintiff made out a prima facie case. In the *Spencer* case, supra, the third headnote is as follows: "When an intervenor in a proceeding for the validation of bonds interposes objections based upon facts which do not appear in the pleadings of the parties, but which depend for the proof of their existence upon aliunde evidence, the burden is upon him to prove the alleged facts thus set up." The intervenor offered no evidence at all. He does not show by evidence, or otherwise, how many, if any, of the females who were registered and voted, did so illegally. But assuming that all of the ten thousand registered females who voted, as shown by the record, were registered and voted illegally, still if all of these were deducted from the total number of registered votes, as shown by the record, viz., 27,070, this would leave 17,070 *male* registered voters. It appears from the record that the highest number of votes cast in favor of any issue of bonds was for public schools, viz., 21,633, and the smallest number cast for any issue of bonds was 21,194; and that the highest vote cast against any issue was 1034, and the smallest vote cast against any issue was 513. So the vote cast for each of the issues of bonds was above 21,000 votes. Assuming therefore, that all of the 10,000 females were disqualified, and that all voted for the bonds, deducting this number from the 21,000 votes cast for the various issues of bonds, this would leave 11,000 as voting for bonds out of the 17,070 registered male voters. Adding the highest number of votes cast against any issue of bonds, viz., 1034, to the number of votes for that issue, we have a total of 12,034 votes cast. The number of affirmative votes is therefore obviously more than two thirds of the qualified voters who voted at said election, as well as a majority of the qualified voters of such municipality. Therefore, even if the 10,000 female registered voters should be excluded, the result of the election is the same, the bonds having received the requisite constitutional majority. See, in this connection, Civil Code (1910), § 126.

*Epping* v. *Columbus,* 117 *Ga.* 263 (16), 285 (43 S. E. 803);
*Brumby* v. *Marietta,* supra.

4. It is insisted that a reversal of the judgment of the court below validating the bonds should be had, because the plaintiff did not carry the burden of proof in making out the case for validation. It is argued that the only proof as to the vote on the bonds was the introduction of the copy from the minutes of the city council, certified by the clerk, purporting to show a consolidation of the vote by the council, not jointly with the managers of the election, as required by the statute, but upon the returns previously made to them by the managers. We have already referred to the question of the burden of proof in such cases, in a preceding division of this opinion; and with reference to the argument just referred to, it appears from the resolution consolidating the returns that "the consolidated returns of the duly elected election commissioners or managers, as made to the mayor and general council of this city, on this date, and consolidated and the result declared, shows that" the results were . . "in favor of each issue submitted to the voters in said election, and that the bonds were carried by the required number of votes; and the result is hereby accordingly declared and ordered spread upon the minutes." This consolidation was prima facie correct, and the burden would then be on the intervenor to show that the result of the election was inaccurate and different from that submitted by the mayor and general council. *Sewell* v. *Tallapoosa,* 145 *Ga.* 19 (2), 22 (88 S. E. 577). The intervenor failed to carry this burden. Properly construed, we think the resolution means that the consolidated returns were made by the managers of the election and the mayor and general council of the City of Atlanta.

5. Other grounds of exception are without merit.

*Judgment affirmed on the main bill of exceptions; cross-bills dismissed. All the Justices concur, except Fish, C. J., absent because of sickness.*